Page number 15, 1691. United States of America v. Riley Patrick Lively. Arguments not to exceed 15 minutes per side. Mr. Friedman for the appellate. Good morning, your honors. I would like to reserve five minutes of time for rebuttal. This is an appeal from the Western District of Michigan on one count of a charge of production of child pornography. I've raised three charges. I think it's sort of fitting that I'm standing here in the court room because I really think that's where the argument belongs. I think the court made a wrong turn in 1977 and failed to follow inner panel stare decisis, but I think it would be probably incorrect for a panel at this point to make the trip correction. I would be happy to entertain any questions on it, but what I'd like to do is focus on issue one and two, and with the court's permission, I'd like to argue them jointly because I think that they're two sides of the same coin. The issue in those two cases, in those two arguments, are whether or not the government presented sufficient connection with interstate commerce and whether Judge Yonkers improperly refused to give a special jury instruction that at least placed that question in the hands of the jury. What makes this case unique is two things. First of all, all the evidence in the record suggests that this is a noncommercial production case. There's no evidence that these images ever were transmitted over the internet or otherwise left state, which leaves the government with the method of argument that it was created via the instrumentalities of interstate commerce, and I'm going to respectfully submit at this point they can't rely on the computer, and I'm going to say three reasons real quickly because I know this is going to be a major part of my opponent's argument. The thumbnails that were found on the hard drive that was unquestionably produced in interstate commerce, we don't know the time, manner that they were produced, and we don't know, more importantly, that they were on that machine for editing, for transmission, for anything other than viewing, and it could have happened after the conspiracy had ended. Why do those things matter? In other words, if the four images are on the hard drive of the computer and the hard drive is manufactured in a device that was transported in interstate, international commerce? The thumbnails, which are really artifacts of the images, only show that there was viewing. I mean, that's all we can determine because Mr. Norwood Charlier's hard drive was encrypted. Why is that not enough? Assuming that you're right that it only shows viewing, why isn't that enough to meet the statutory requirements? Because in order for there to be viewing, there had to be storage, right? I mean, it had to be on the computer for some period of time for him to view it, so that was a means of facilitating the viewing. What I understand about computers is that there would be analogous to the Internet cache cases that you've dealt with in other contexts, where the person looks at a website that contains child pornographic images or other contraband, and the machine, in the process, creates an image in a cache that resides, and the person may or may not know it is actually on the hard drive. I don't think it's that complicated. I mean, I'm not sure. I might suggest a slightly different way to put the point. There were two productions here. I think the case law makes it clear there were two productions. There's a production with the Kodak digital camera, and there's a production when it's reproduced on the hard drive. So you're kind of stuck under the case law with there being two productions. But the statute requires the abuse to be for the purpose of each production, and that's what I think is difficult about the government's case. Because I think there's plenty of evidence – I mean, I think all of the evidence is that the abuse was for the purpose of the Kodak production. But they didn't – they put on evidence about connection to interstate or foreign commerce with respect to the hard drive. They didn't as to the Kodak. So that's what – so they've got a mixing and matching problem. So I don't think it's a production issue. It's the abuse was for the purpose of each production is the question, and their evidence of interstate commerce goes only to the hard drive. And I don't think there's evidence in the case that your client abused LS for the purpose of the hard drive production. It was for the purpose of the Kodak production because that was the other fellow there taking the picture. So I don't think it's worth fighting about whether there were two productions. There were. The question is what was the abuse for the purpose of and what does the evidence show? And then was that device connected to interstate commerce? I thank the court for its statement. You're far more eloquent than I could have been on that point. I think that the question on the memory card is the camera was put into evidence, but nobody talked about what was on the memory card until prosecution closing arguments when Mr. Blanchard had pointed out the omission in the government's case and invited the jury to look and see what was on the memory card. And I don't know. I mean, I can speculate, but speculation isn't evidence. And 20 years ago, I argued a case in front of this in this very courtroom called Barker v. Yukins, which pointed out that my client is entitled to a trial by jury, not appellate court. And they didn't meet that. Now, it just so happens, however, that the memory card does have this inscription made in China. I mean, so that leads to the question whether if there was error, it was harmless. In other words, I think the government had the wrong theory, but there is evidence in the case that says the memory card bore the inscription made in China. That's not how they presented it to the jury. I'm not sure they even put that evidence in for this purpose. But that makes me wonder if it's harmless. Well, Rule 105 obviously says that evidence for one purpose isn't necessarily admitted for another. And I think that this is particularly the case. But why was that evidence put in? They introduced the camera as a whole, and it was as the means of that it was the instrumentality, that it was the item that was used to take the photograph. This is the Kodak camera that took the pictures of LS, and here's the proof of it. And it's clear that it's tied to Mr. Norwood Charlier because of the fact that the other images… There was no differentiation between the two productions? The camera, rather, the evidence of the camera was not differentiated between the two? Or was it evidence against both or for both purposes? Is that what you're saying? Well, my read of the transcript, and I didn't expect that I would go down this path, and that may be my fault. So to the extent that I'm relying on my failed memory on that, I would ask some indulgence. But it was as if the government offered it to say, look at this camera, look at the other pictures. This is where it came from, this is where it sat, and this is why it was produced. I don't think that they were saying this was introduced to show interstate cameras. Juxtapose it with the testimony that was used on the hard drive. There was not that kind of testimony with respect to the SanDisk memory stick. As far as harmless, I would go back and point out the same point, is that no matter how compelling an evidence may be, if it wasn't presented to the jury, and the question, of course, is whether it was. But if the evidence that was presented to the jury included the fact that the camera or its component had the sign on it made in China, then what kind of argument could you have that it wasn't harmless error? Well, first of all, I could insist, say that that was hearsay absent some authentication. I recognize that there's a lot of testimony, a lot of cases out there, excuse me, which speak about brand marking being self-authenticating, but that was not broached in the trial court. And I would also point out, as I am hitting the yellow light, that this isn't always reliable. I've seen many watches that say Rolex, made in Switzerland, and they're not. That, of course, probably, I understand there are the laws of probability, does not mean it was made in Michigan. But that's a jury question. It's an element. It should have gone to the jury, and there have been a lot of cases where the court has reversed, even though the defendant's guilt oozed out of the record, based on a missing element. What did the jury instruction say? Did it rely entirely on the hard drive being made in Thailand, or was it open enough that the jury could have been relying on the camera and the other item being made in China? With the court's permission, with six seconds on the clock, I'd like to address that and rebuttal.  Thank you, Your Honor. Sure. Thank you. Good morning, Your Honors. May it please the Court, my name is Tessa Hess-Miller. I represent the government in this case, as I did at the trial court level. So Judge Sutton has raised the question about the language in 2251A for the purpose of producing. Can you start off with your analysis of that issue? Yes, Your Honor. The statute does require that a person induce, persuade, et cetera, a child for the purpose of producing an image that depicts sexually explicit conduct. It does not truncate the analysis at the first machinery or the first equipment that's used to produce it, and each subsequent production of the image is not viewed under the statute as subsequent production. I don't think that would require you to put on evidence that he did this abuse so that this fellow could take the Kodak picture and then did it so he could download it and then watch it on the computer. I mean, there's no evidence on that. There was evidence. In most digital cameras, you can look at the image right there. So I don't know where you get that. I get the idea that it's a fair inference. One could argue, well, if you take it with a digital camera, the odds are pretty high you're going to download it somewhere. But as I understand it, that's not really how the case was argued or the evidence was presented. So I don't think there's much evidence other than his doing it for the purpose of the guy taking the Kodak picture. Well, Your Honor, the picture was found both on the camera, as Your Honor's know, and on the hard drive. And just to be specific, the hard drive was in the living room of the house where the images were taken, and it was seized. It's not his. It's not the defendant's. It doesn't need to be, Your Honor. No, I'm not saying that matters by itself. I'm just making the point it's the other fellow's camera, it's the other fellow's hard drive, and it's the defendant who's supposed to be abusing someone for the purpose of these pictures. And it's clearly true for the Kodak thing. He has to see that. But there's no evidence about what happened next or what was going to happen next once the Kodak picture was taken. Sure. And, Your Honor, the hard drive was seized within the week that the pictures were taken. So just for a time frame, it was not some fourth party or something far down the road. It was seized within the week of the images being taken and produced. I want to draw the court's attention to an analogy that might help with this analysis, where if a person abuses a child for the purpose of producing a picture and an old-fashioned 35-millimeter film camera is used, the sexual abuse is for the purpose of producing a picture. The statute would still criminalize a person who takes a picture on a 35-millimeter camera on Polaroid film, let's say, which is then later, whether by the defendant or by someone else, sent off to a film lab to be processed, mailed back to someone. That process of producing a picture still counts, whether it was the defendant who did it or even if the defendant knew about it. It is the process of producing a picture. Similarly, the process of producing a picture using a digital camera, not an Internet-capable smartphone, just a regular digital camera, is to hook it up to a computer and produce it that way. But not necessarily. I mean, first of all, you could put in evidence that says just what you said, that this is the normal way you do it. But as I understand it, most digital cameras, I mean, that's what you do. You snap it, and then you see how the picture looked before you decide whether to snap again, and then it's preserved on the camera. So, I mean, God only knows why someone does this in the first instance. We don't know why they wouldn't be happy enough with the silly camera. Right. And that may be the fact. That may be true, Your Honor, that the camera alone, if the camera pictures never went on to the computer, obviously the camera alone was the only thing that produced images, and we would only be looking at that. But you didn't put in any evidence that the camera alone was manufactured or transported in interstate commerce. Correct, Your Honor. Just the SD card that was inside of it, which did say made in China on it, which is self-authenticating under 9027 and doesn't require any testimony. That just came in. I mean, I'm not being critical, but I think the whole argument was about the hard drive being for the purpose. Yes, Your Honor. And now, being here in hindsight, I wish that we had focused on the camera. But it seemed obvious to the government at the time under the statute that any portion of the equipment used in the production of the image, whether it was the hard drive, the SD card, the camera, the keyboard, the mouse, the bed, really anything, was produced outside the state, then it would count. And there was a stipulation as to the hard drive, so the government focused on that. So let's get to the statutory language. You're using 2251A, right? Yes, Your Honor. So any person who coerces any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct. So we've gotten through there, but then you're using subpart 2. If that visual depiction was produced or transmitted, am I right that that's the key one? Correct, Your Honor. So the linkage problem is that for the purpose of producing any visual depiction, if that visual depiction was produced using materials, so you, in order to show the interstate commerce aspect, you have focused on the hard drive. Correct, Your Honor. But for the purpose of producing any visual depiction, you've been focusing on the camera. So this is where, arguably, there is the flaw in the linkage. We are using the second prong, Your Honor, which courts, including the Torrell Court and the Fifth Circuit, have recognized, does not require the defendant to be the one who used the equipment and does not require the defendant to know that the equipment was being used. The court's distinction that it's drawing here this morning of whether that visual depiction is the first visual depiction or a subsequent visual depiction is not a distinction that other courts have made. The visual depiction can be, in the analogy that I was using, the film itself, the printed product, a slide, or a later image on a computer. The visual depiction is really what's being captured in the image rather than the machine. I think another way of saying what you're saying is there were two productions here. I'm not saying that, Your Honor. I know that that's... But you agree there were two productions here. I would not. There were multiple steps in the same production, I would say, just like sending film off to a lab and putting a picture in a picture album. See, I would have said production one is when you snap the Kodak and you can see the image, the visual depiction right there, and production two is when you download on the hard drive. Maybe there's some more, but I would have said the core of the case is there were two productions, and that's because of all of our case law that talks about how easy it is in this area to have multiple productions. So I'm totally on board with all of that, but that's the word production. It's not about the purpose. It's the purpose language that's the problem to me. But the purpose, Your Honor, does not have to be the purpose of producing this visual depiction on this machine, this thumbnail image on the computer. Why not? The language is for producing a visual depiction. Well, it's producing any visual depiction. Correct, Your Honor. Which supports your point, but then you get to the subpart two, if that visual depiction... And I think that visual depiction, Your Honor, just means the visual depiction they were just talking about in the previous clause, the visual depiction of this child's sexual abuse. But you were talking about it for the purpose of producing any visual depiction as saying, hey, look, he did it on this Kodak camera. Correct, Your Honor. And then if you go to subpart two, if that visual depiction was produced using interstate commerce materials, but the problem is the Kodak camera, there's no evidence, was... Well, the court's same analysis could be applied even if the government had relied more on the SD card being made in China, that the defendant produced the picture for the purpose of the Kodak camera taking a picture, and so does the SD card inside count? Because he didn't know about that or think about that. He didn't argue that, and that was not why that card was admitted into evidence. Your interstate commerce argument was related to the hard drive stuff. It was, Your Honor, because as the government still argues, either production of the image counts because it was produced of that image. But what's the evidence that the defendant abused this kid for the purpose of the hard drive production? That's the thing I can't quite figure out. Where's that evidence? I think we're going around in circles, Your Honor, but the evidence that the defendant did the sexual explicit act for the purpose of producing an image, which was ultimately found on a computer, which is consistent with case law in possession, receipt, distribution, and production cases, that if the image is later found on a thumb drive, a CD, or a computer, it doesn't matter where it originally came from, whether it originally came from a camera, a cell phone, a film camera. If it is ultimately found on a thumb drive, a CD, a computer, a hard drive, et cetera, it counts. So you're saying that there was, you're disagreeing with Judge Sutton, that you said there was one production, and that was the creation of the image through snapping, and that no matter how many other instruments it's found on, it was created one time. Maybe that's the way to say it, Your Honor. Yes, that the act was done one time. On this other part, though, there was evidence in the record that these images and things were shared with others. Is that correct? Not these particular images, no, Your Honor. Other images that Norwood was arrested for at the time that the computer was seized. You would agree if all that had happened here was, oddly enough, you have some camera that you don't print anything, it can't be downloaded, you can just see it there, and the camera's just from Michigan, made in Michigan, maybe handmade for God's sakes, and all you have in the case is the abuse for the visual depiction on that camera in that state, you would not satisfy the interstate commerce element, right? Correct, Your Honor. Okay, so what I'm just struggling with is you have two, I mean, this is where the production stuff hurts you a little bit, because you can have multiple productions of the same visual depiction, and what's troubling to me is the evidence all shows abuse for one visual depiction, but not for the other. That's my struggle. I know you're right, we're going around in circles, I agree with you. And the case law just doesn't see it as two productions. It's just I understand what the court's saying, that if you take a picture at one point and you later do something with it, or you make a copy, maybe you make a black and white copy, those are all different steps, but I disagree that they're different productions. The case law does not say that they're different productions. There's one production, and then it's reproduced, copied, viewed, all of which are defined as production, and the case law in every circuit defines production very broadly, defines production as a non-technical term, something that should be viewed broadly, in light of Congress's strong justification in regulating even what they call purely homegrown intrastate child pornography production, that Congress has a compelling need to regulate child pornography and can hang its jurisdictional hook on the smallest thing, whether it's a subsequent production that the defendant knew or didn't know about, or if the image is found on a device made outside the state, it counts. It's a yes or no question. In terms of the SD card, which also supports the conviction, although it was not the theory that the government presented, just in a desire to simplify and go with the jurisdictional hook that was stipulated to. Judge Moore asked this. How was the jury instructed on that? I mean, in what direction was the jury asked to look? The jury was given the standard jury instructions for the Sixth Circuit, and they did not, the judge did not talk about the hard drive in the instructions. So the judge said if the image is essentially produced using materials that are shipped or transported in interstate or foreign commerce, meaning that they came from somewhere else, then it counts. But the judge did not talk about the hard drive, and the indictment charges materials including, but not limited to, this hard drive made in Thailand. So the indictment encompassed other equipment along the way. The jury's instruction did not focus the jury on the purpose point. It did not focus it on the hard drive point. It did focus on what is the purpose of this sexual act. Was it to produce, create a picture? But not was it to produce a picture on a hard drive. No, that was not part of the instructions. I want to go back to the argument that the SD card would only have been reliable upon by the jury if there had been some sort of limiting instruction, that the absence of a limiting instruction was somehow plain error. It was not. The SD card was admitted for the purpose of showing that it did have the same copies of the same images on it. It was put on the projector. It was blown up for the jury. It was passed around. The entire jury handled the SD card, and it went back with the jury. Did anybody say anything about the fact that the SD card said made in China? No, Your Honor. So you're really, on this point at least, relying on the jury noticing on its own that the SD card said made in China. Correct, Your Honor, which is why I brought it up in rebuttal in case they were having some issue with the hard drive. Again, at the time of trial and now at the time of the appeal, the government has no issue with the interstate nexus being relying solely on the hard drive. But in the event that there was an issue, the SD card qualifies, and 9027 allows trade inscriptions to come in for all sorts of things, firearms, medications, even company logos on documents have come in in multiple cases in the Sixth Circuit. And the failure to object to the government's argument in rebuttal would be reviewed for plain error. I haven't addressed the pre-indictment delay, and I'm running out of time, but if the court has any issues of it, I would like to answer any questions that the court might have. Should we recommend enbanking the case? No, Your Honor. The case law is very well settled, and I don't recommend an enbank decision. Even under the defendant's best-case scenario with a winning enbank opinion, it still requires actual showing of substantial and actual non-speculative prejudice, which the defendant just hasn't done in this case. Thank you, Your Honors. Thank you. The transcripts use the word materials with respect to the interstate commerce, and what you want to look at primarily is page IDs 907 through 909 for that particular instruction. All I'm going to say in response is my opponent talked about an analog camera. I'd like to use the analogy, what if a wallet was admitted and the jury decided to go read through every single document in a person's wallet? Would that then be admissible for the truth of the matter asserted, even though it was simply introduced for other reasons? I don't think so. I would use it as a simple example. Let's say it was a marijuana case, and the defendant had a state medical marijuana card in his wallet, which I think we can all agree isn't worth the paper it's printed on in this court. Would the jury be allowed to speculate, invent the defense? I mean, that's what we're talking about in the other direction. Help me with this. I can't quite figure this out in my head. There's no difference to harmless error in sufficiency cases involving criminals. So, I mean, in a criminal case, if you win a sufficiency case, it's double jeopardy, right? They can't try you again. I'm pretty sure I've got that right. So I'm wondering, with harmless error, how does that work? I mean, because you're not going to have another. When you think of harmless error, you're usually thinking, well, why are we going to start all over again? We know there's this other fact. It solves the problem. But given double jeopardy rules, I'm trying to figure out how harmless error works. Does it really, even if they didn't put it in for the right reason, or as you say, it would be hearsay if they hadn't crossed the T's and dotted the I's, how does it work? I know they're not allowed to have a new trial if it's a sufficiency problem. It's not a jury instruction error, at least so far. Can you help me with this? I think I win, and I think that's a difficult position for people emotionally to get to, and I understand that.  There is, but there isn't when it requires an appellate court to find a fact that wasn't found by the jury. That's where I think the harmless error analysis would break down. If it would require you to find a fact that that jury didn't find. But if the jury wasn't required to find that the hard drive moved in Interstate Commerce, the jury was just instructed in this broad instruction, so I don't know how you'd be arguing that we, the appellate court, were finding something the jury didn't find. We don't know what the jury found, except that they decided that your client violated the statute. I understand that, and obviously any time we have a case where there's a jury verdict, there's a certain element of speculation that goes on. We have to look at the extrinsic evidence that surrounds it and come to our best conclusion as to what they found. We can't pull them. It's not admissible, and I think it's a good rule that it's not with respect to that. But I think that the evidence shows, and I think this argument in the concessions are, that if you find that the memory card is a necessary linkage, if it's a hard drive, I'm in trouble. And I'll concede that, but with the memory card, defense counsel saw a gap in effective assistance of government, or whatever you want to call it. He saw an opportunity. He rested quickly and decided to play his cards at that point. Whether or not that was a brilliant legal move or a fatal legal move, I guess remains to be seen, but I don't think you can fill in something if you determine that the jury didn't actually reach that. If it was, you know, I'm using way too much. Since the government put the memory card in, and she says that it had the legend on it made in China, and under the rule 902, she says that the jury can consider that brand or that designation as evidence. So your point is, even though the memory card came into evidence with that particular legend on it, because the government didn't make specific reference and give the jury direction for what purpose that was being entered, you're saying that that negates their claim that there was evidence put in on that fact? I obviously don't love the way Your Honor characterized it, but essentially, yes. I am saying that there wasn't a foundation. It wasn't put in in that way, and we're back-filling for a gap in the prosecution's case. I've got six seconds on the clock, but I'm happy to entertain any other questions. Well, thank you. Thank you. We'll close for the argument. The case will be submitted.